HART, J., dissents. Chief Justice McCULLOCH, not participating.

---

ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY
*v.* SIMS.

Opinion delivered January 13, 1913.

RAILROADS—AUTHORITY OF CONDUCTOR AND SPECIAL AGENT—LIABILITY FOR ARREST OF TRESPASSER.—Where plaintiff is a trespasser on the train of defendant, and was believed by the conductor and a special agent of the defendant, to have committed a murder, and to have placed the body of the deceased upon the track, and they caused the arrest of the plaintiff, their acts were prompted by what they believed to be their duty as citizens and officers for the public good, and having nothing to do with the management or protection of the railway company's property, their acts went entirely beyond their line of duty and the scope of their authority, and the railway company is not liable therefor.

Appeal from Hot Spring Circuit Court; *W. H. Evans,* Judge; reversed.

STATEMENT BY THE COURT.

This suit was brought by the appellee, through his next friend, to recover damages for alleged false imprisonment of the appellee. The complaint alleged that James Sims was a passenger upon the defendant's train from Benton to Little Rock, Arkansas, and that while a passenger defendant's officers and agents seized and imprisoned the plaintiff and compelled him to go with them to the police station in Little Rock and there imprisoned him for six days without probable cause and without any right or authority to do so and against the will of the plaintiff, whereby he was damaged in the sum of $10,000. There was a second count in the complaint, for vindictive damages, and a prayer for $10,000.

The appellant answered, denying the material allegations of the complaint, and among other defenses, set up "that if any of its servants had participated in said arrest they were acting outside of the scope of their authority, and that such acts had never been ratified by the defendant."

The facts are substantially as follows: Appellee, a boy seventeen years of age, boarded the baggage car of appellant's train at Malvern and rode on same to Alexander. When the train stopped there he got off to keep the train crew from seeing him. As the train started he got back on. When he got back on he was discovered. He was "beating" his way from Malvern to Little Rock. There was another man also on the baggage car who was "beating" his way. A passenger on the train discovered the appellee and the other man and took appellee by the arm and took him into the car and searched him. The conductor "told the Texas fellow to hold us until he could get Mr. Lambert." When the train arrived at Little Rock Lambert, who was special agent of the appellant, took charge of appellee. Lambert was informed by the conductor that he had two parties on the train (appellee being one of them) whom they suspected of killing a man. Lambert, who held a commission as deputy constable, called up the constable's office at Little Rock and told the constable that he had appellee and requested him to come to the station

and get appellee. Lambert, the special agent, turned appellee over to the deputy constable. He was taken by the deputy constable before a justice of the peace, and there, upon information, a warrant was issued for his arrest, and he was detained in custody for about six days, when he was discharged by the magistrate who had issued the warrant for his arrest. The deputy constable who first took appellee in charge on the train was a special agent of the Wells Fargo & Co. express, and was a deputy sheriff. He was working for the railway company most of the time he was deputy sheriff.

Lambert, the special agent who first took charge of the appellee after he reached Little Rock was working for the railway company. He was employed for the purpose of making arrests when the circumstances required it.

It was agreed by the parties that "J. M. Lambert was at the time of the arrest of James Sims, on the 15th day of May, 1911, the agent of the St. Louis, Iron Mountain & Southern Railway Company, in the capacity of a detective officer to look after the interests of the said St. Louis, Iron Mountain & Southern Railway Company, and that it was his special duty to look up violators of the law or persons committing any wrongs against the said railway company or its property."

The testimony on behalf of the appellant tended to show that the conductor had authority, as conductor, to arrest the appellee. He took the appellee to Lambert when he arrived at Little Rock because he knew that Lambert was working for the company, was a deputy constable, and had authority to make arrests. The doctor had told him (the conductor) that the man that was killed and who was found lying on the railroad track near Bryant was hit with some blunt instrument. The conductor didn't think he was struck by the train from the position in which he was lying, flat on his back on the track. He didn't think that any part of the train could have hit him. He was not cold when they found him.

The testimony also tended to show, that the appellee was turned over to Lambert by the conductor and by him detained until the constable carried him before the magistrate,

because they suspected that he and his companion had killed the man who had been found on the track near Bryant station.

Among other prayers for instructions, the appellant requested the following, which were refused, viz:

"5.   If you believe from the evidence that the plaintiff was on the train with no intention of paying fare, but for the purpose of stealing a ride, then the railroad company owed him no duty, and even if the conductor or trainmen did wrongfully arrest him for murder the railroad company would not be responsible for such wrongful arrest."

"6.   You are further told that if the trainmen arrested the defendant, or caused his arrest, and turned him over to the officers of the law, neither the trainmen nor the defendant would be responsible for his detention after he was taken into custody by the officers."

"9.   You are told that the law does not authorize a conductor or special agent of a railroad company to make arrests for murder; and, if they do so, the company can be held liable for wrongful arrests only upon proof that they were authorized by the company to make such arrests, and were acting within the scope of their employment and in the furtherance of the business of the company in making the same.  There is no presumption that they were so acting; but it devolves upon the plaintiff to show by the greater weight of the evidence that the servant alleged to have made or caused the arrest was authorized to make the same, or that the same was subsequently ratified; and if in this case the plaintiff has failed to show these facts by a preponderance of the evidence, your verdict should be for the defendant."

The court modified this prayer No. 9 by telling the jury that the appellant would be liable if its special agent or conductor was authorized to make the arrest or if they were acting in so doing within the apparent scope of their authority and employment.

"12.   Although you may believe from the evidence that special agent Lambert took charge of plaintiff, but that he did so as constable, and that he was not authorized by defendant to make arrests for murder and had never made such arrests, and that he was only authorized by defendant to make arrests when persons were found actually engaged in

committing crimes against the property of the defendant, and had never made arrests as special agent for any other offenses, then the defendant is not liable for any act of special agent Lambert in this case."

"13.  You are instructed that if you find from the evidence that special agent Lambert was a deputy constable, and that plaintiff was arrested or detained by Mr. Mallard, and was by him turned over to Mr. Lambert, who as deputy constable received him and notified the officers, and that Mr. Lambert was acting as constable and not as the agent of the defendant, then the defendant would not be liable, although you may believe that the conductor notified Mr. Lambert that the plaintiff was in custody of Mr. Mallard, and asked him to go and get him."

It is unnecessary to set forth other prayers for instructions which were granted and refused, to which exceptions were saved.  The above are sufficient to present the question upon which the opinion turns.  The verdict and judgment were in favor of the appellee for $1,500.  The appellant duly prosecutes this appeal.

*E. B. Kinsworthy, W. V. Tompkins* and *W. G. Riddick,* for appellant.

1.  The evidence does not support the verdict, because (a) the servants of appellant in making the arrest were not acting within the scope of their authority, but outside the course of their employment.  162 Mass. 319; 93 Ark. 397; 31 Minn. 351; 97 Ark. 24; 207 Pa. 447; 136 N. C. 517; 51 Md. 290; 78 Md. 406; 41 Ia. 358; 65 Ark. 144; 129 N. Y. 506; 120 N. Y. 117; 107 Ala. 233; 87 Ark. 524; 88 Ark. 583.  See also, 39 N. Y. 381; 67 N. Y. S. 651; 58 Ill. App. 278; 25 Ky. Law Rep. 1750, 78 S. W. 870; 193 Mo. 46; Wood on Master & Servant, § 538.

(b)  The arrest of appellee was legal.  40 N. Y. 463; 43 Ark. 99; Kirby's Dig., § 2119; 2 S. W. 904; 60 S. W. 847; 3 Wend. 350; 48 N. C. 443; 89 N. C. 290; 6 Humph. (Tenn.) 53; 93 Cal. 222; 96 Ark. 325.

2.  The effect of instructions 6 and 11 was to charge the jury that appellant could not be held liable for the time appellee was detained by the officers of the law, or for his detention

under the warrant and commitment. These instructions should have been given. 97 N. Y. 590; 87 N. Y. 56; 94 Mich. 1; 27 Kan. 450; 9 Kan. 427; 49 Mich. 348; 38 Barb. 339; 116 Ala. 606; 103 Ala. 345; 10 Col. App. 532, 51 Pac. 1016; 133 Mich. 463; 54 Hun 335.

3. The fifth instruction requested by appellant is in accordance with the well established rule that a railway company owes no duty to a trespasser other than to refrain from wantonly injuring him, and should have been given. Moreover, appellee having alleged that he was a passenger, appellant was entitled to have the jury instructed, and to present the fact to the jury, that he was a mere trespasser.

4. The court erred in modifying the second, fourth, seventh and ninth instructions so as to make appellant liable if the agents were acting within the apparent scope of their authority.

*A. J. Rowland* and *Mehaffy, Reid & Mehaffy,* for appellee.

1. The evidence amply sustains the verdict. Bass, the conductor, and Lambert, the special agent, or "detective," were in the employ of, and at work for, appellant. Both had authority to make arrests in certain cases and were at the time acting within the scope or apparent scope of their authority. Even if they exceeded their authority the company would still be liable. 58 Ark. 381; 28 Atl. 182; 31 L. R. A. 702; 50 Am. Rep. 102; Hale on Torts, Hornbook Series, 246; 53 N. W. 995; 99 N. Y. S. 969.

2. There was no error in refusing instructions 6 and 11. If it can be insisted that appellee's confinement at any time was under lawful process, such process was issued and served its purpose only in so far as the parties who instigated the arrest acquiesced and directed. The arrest and confinement was one continuous act. Unauthorized continuance of imprisonment renders all parties liable who are parties to or assisting therein. 51 Barb. (N. Y.) 102; 24 Wend. (N. Y.) 418.

3. If appellant is correct in its contention that the liability of a principal for the act of his agent within the apparent scope of his authority has no application to cases of false imprisonment, still the modification of instructions 2, 4, 7 and 9 was in no sense prejudicial. 31 L. R. A. 704.

WOOD, J., (after stating the facts).  Conceding that the conductor, Bass, and the special agent, Lambert, were instrumental in causing the arrest and imprisonment of appellee still there is no testimony tending to prove that in so doing they were acting within the line of their duty or within the scope of their authority as the agents of the appellant.  The burden was upon the appellee to show that these agents of the appellant, in making the arrest and causing the imprisonment of appellee, were acting within the scope of their authority, real or apparent.  The testimony does not show that the conductor was authorized to make arrests of people on his train, whether passengers or trespassers, for the crime of murder not committed in connection with the running of the train. The duty of the conductor is to superintend and control the running of the train in his charge, and to protect the passengers in their rights as such.  The most that the evidence tends to establish on behalf of appellee, giving it its strongest probative force, is that appellant's conductor arrested appellee and had him imprisoned because he, the conductor, had been informed that a man had been murdered and placed on appellant's track and because the conductor suspected, without cause therefor, that appellee had committed the crime.  But is it not within the scope of the authority of the conductor, as shown by the evidence in the record, to make arrests or have same made for such crimes.

The testimony shows that the conductor had authority to arrest a person on his train when in an intoxicated condition, or who was "raising a disturbance on the train," but there is no affirmative evidence that the conductor had authority to arrest in any other instance or under any other circumstances. The train had passed over the man who was found dead on appellant's track before the conductor caused the arrest and detention of appellee.  It was therefore not necessary to cause the arrest to be made in order to protect the passengers on the train.  At that time the passengers were not in danger by reason of anything that appellee was doing or anything that appellee had done, even if he had killed the man found on the track.  So it was not necessary for the conductor to make the arrest in order to protect his passengers or to properly conduct the operation of his train.  There is nothing to show that the

railway company held the conductor out as having such authority. There is nothing from which such authority would appear from the ordinary duties of a conductor, and certainly nothing in the performance of those duties from which authority could be implied.

The undisputed evidence likewise shows that special agent Lambert had no authority to make arrests in cases of murder unless the arrest was necessary to protect appellant's property. Lambert "had authority as special agent to make arrests where anything went wrong with the line," by which he meant "if he came onto a person breaking into a box car or committing any other crimes against the property" of appellant he could make the arrest. Certainly it could not be inferred from this testimony that Lambert had authority to make arrests of persons for the crime of murder, such arrests not having any connection with the protection of appellant's line or property.

As before stated, if appellee really murdered the man found dead on appellant's track and placed the corpse on the track for the purpose of derailing the cars, or for the purpose of making it appear that the man had been killed by the train, still such acts were not in any manner injurious to appellant's line or property. The acts had passed and no injurious consequences had resulted thereform to appellant's line or train, and therefore the arrest was made for an offense wholly disconnected from any necessary protection or preservation of appellant's property, and therefore the arrest was entirely beyond Lambert's line of duty or scope of authority.

Under the undisputed evidence, as we view the record, Lambert had no authority, either expressed or implied, nor was it within the apparent scope of his authority to cause the arrest and imprisonment of one for an alleged murder that had no connection with the duty imposed upon Lambert as special agent, and the authority given him as such, to protect appellant's line and property from injury. The arrest and imprisonment complained of in this case, according to the uncontroverted evidence, was not in furtherance of the business of the appellant or for its benefit. The proof shows that the conduct of appellant's agents in causing the arrest and imprisonment of appellee was prompted by what they supposed to be their duty as citizens and officers for the public welfare in the

punishment of crime. For such acts appellant is not liable.

In *Mayfield* v. *St. Louis, I. M. & S. Ry. Co.*, 97 Ark. 24, we reiterated the doctrine often before announced that a railway company was not liable for the negligent or wrongful acts of its agents or servants unless done in the line of their duty and within the scope of the authority conferred upon them. In that case we said, "The procurement of the arrest of plaintiff was not done in the ordinary course of the business of the company, nor was it for its benefit, except in so far as it might be for the benefit of all the people of the State that a criminal should be arrested, prosecuted and convicted. If the agent, acting from a sense of public duty, should cause the arrest of an offender his conduct would in no way be connected with his employer so as to fix upon him a liability." See cases cited in the opinion.

It follows from what we have said that the court erred in not granting the prayer of appellant for a peremptory verdict, and also in its rulings upon other prayers set forth in the statement. The judgment is therefore reversed and the cause dismissed.